## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **JASMINE L. GONSALVES,** | : | |
| **Plaintiff** | : | |
| **v.** | : | **C.A. No. 22-** |
| | : | |
| **ENTERPRISE RENT-A-CAR** | : | |
| **COMPANY OF BOSTON, LLC, alias,** | : | **<u>Jury Trial Demanded</u>** |
| **Defendant.** | : | |

### COMPLAINT

### I.    <u>Introductory Statement</u>

This action is brought by the Plaintiff seeking declaratory and injunctive relief and compensatory and punitive damages for Defendant's acts and/or omissions in violation of Plaintiff's rights under **Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,** *et seq.* **("Title VII")**, the **Massachusetts Fair Employment Practices Act, M.G.L. c. 151B § 1,** *et seq.* **("FEPA")**, the **Family Medical Leave Act, 29 U.S.C. §2601,** *et seq.* **("FMLA")**, **Massachusetts Paid Family Medical Leave Act, M.G.L. c 175M §1** *et seq.* **("PFML")**, and the **Massachusetts Parental Leave Act, M.G.L. c. 149, §105D ("MPLA")**.

### II.    <u>Parties</u>

1.    Plaintiff Jasmine L. Gonsalves is a resident of the City of New Bedford, County of Bristol, and Commonwealth of Massachusetts.

2.    Defendant Enterprise Rent-A-Car Company of Boston, LLC, alias, (hereinafter "Enterprise" or "Defendant") is a foreign corporation duly incorporated under the laws of the State of Delaware with a principal place of business located at 600 Corporate Park Drive, Saint Louis, MO 63105. Enterprise is registered to do business within the Commonwealth of Massachusetts with a registered Massachusetts office located at 10 2nd Ave, Burlington, MA 01803 and branch

located at 332 Iyannough Road, Hyannis, MA 02601 where Plaintiff was employed at all times relevant to this action.

3.      At all relevant times, Defendant was engaged in commerce and/or in an industry affecting commerce.

4.      At all relevant times, Defendant employed fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks.

### III.    Jurisdiction

5.      This Court has jurisdiction pursuant to 28 U.S.C. §§1331 because Plaintiff asserts claims arising under federal law; specifically, Title VII and the FMLA.

6.      This Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202.

7.      Supplemental jurisdiction over the state law claims set forth herein is predicated on 28 U.S.C. § 1367 as they arise out of the same case or controversy.

### IV.    Venue

8.      Venue is proper in this Court since, on information and belief, Defendant is doing business in and therefore is deemed to reside in the District of Massachusetts, and a substantial part of the events or omissions giving rise to the claims occurred in the District of Massachusetts in compliance with the requirements set forth in 28 U.S.C. §1391.

### V.    Exhaustion of Administrative Remedies

9.      On October 22, 2021, Plaintiff filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the United States Equal Employment Opportunity Commission ("EEOC") against Defendant alleging unlawful sex, gender, and caregiver discrimination and retaliation.

10.     Thereafter, Plaintiff filed a request for permission to withdraw her Charge and for a right to sue in civil court with the MCAD and the EEOC.

11.     On December 20, 2022, the MCAD issued Plaintiff a Dismissal and Notice of Right to Sue.

12.     On December 21, 2022, the EEOC issued Plaintiff a Dismissal and Notice of Right to Sue.

13.     Accordingly, insofar as Plaintiff has satisfied all administrative and/or jurisdictional requirements prior to filing a lawsuit, Plaintiff has timely instituted suit in the within matter.

**VI.    <u>Material Facts</u>**

*Factual Background*

14.     Plaintiff is a female caregiver to two (2) young children.

15.     Plaintiff was hired by Enterprise in or about May of 2013.

16.     At all relevant times, Plaintiff was employed as a Branch Manager at Enterprise's branch located at 332 Iyannough Road, Hyannis, MA 02601, which is part of Enterprise's Boston region

17.     As a Branch Manager, Plaintiff's compensation was approximately $110,000.00 per year, including commissions.

18.     As a Branch Manager, Plaintiff was responsible for all branch operations including but not limited to setting goals to exceed prior year performance aligned with corporate and regional expectations (for both growth and profitability), business plan development and execution, employee development, cost control, accounts receivable, and sales management.

19.     Throughout Plaintiff's employment, Plaintiff was a top performing employee and the highest paid Branch Manager in her region.

20.     In fact, during Plaintiff's most recent performance review in April 2021, Plaintiff was rated as exceeding expectations.

21.     Throughout Plaintiff's employment with Enterprise, the leadership of the Boston region that Plaintiff worked in consisted almost entirely of men/males.

22.     Notably, with respect to the few women/females in leadership position within the Boston region, only one of them was a mother or legal guardian of young children.

### *Plaintiff's Caregiver Responsibilities*

23.     Prior to November 2020 and since the onset of her employment, Plaintiff was not a mother or a legal guardian of young children.

24.     In early November 2020, Plaintiff's two (2) godchildren, ages 10 and 8 years old, moved in with Plaintiff due to their guardian being hospitalized from COVID-19.

25.     During that time, Plaintiff had informal communications about her godchildren moving in with her directly with her supervisor and area manager, Chris Collard.

26.     Early December 2020, Plaintiff had a conversation with Mr. Collard explaining that she may need a leave of absence to care for the children and tend to their schooling, medical, and other needs.

27.     On or about December 10, 2020, at the direction Mr. Collard, Plaintiff sent an email to upper management and human resources explaining her situation, the possibility of taking guardianship should her godchildren's then guardian pass away from COVID-19, and taking "time away from coming into the office."

28.     In that email, Plaintiff also noted that she was in the process of gaining emergency custody of the children and mentioned the need for her to find appropriate childcare and online schooling options.

29.     In that email Plaintiff also stated, "This is extremely hard for me to do, as I never want any of you to think I do not care about this operation & never want to jeopardize my position or my teams' sanity."

30.     While the response to Plaintiff's December 10, 2020 email contained statements of purported support for Plaintiff's new role as mother/guardian, Defendant, by and through its agent, failed to disclose or discuss available leave that Plaintiff would be entitled to under the FMLA, PFML, and MPLA because of the placement of the children with her for adoption, foster care, or guardianship or because of a qualifying need related to the school closure or illness or lack of child care due to the COVID-19 pandemic.

31.     Additionally, at that time, Plaintiff had approximately 28 days of available paid time off ("PTO") that she had not utilized, but there was no mention of her option to utilize this option for leave either.

32.     On or about December 20, 2020, Plaintiff was granted formal legal guardianship of the children due to the passing of their previous guardian to COVID-19.

33.     This tragic event was a drastic change in Plaintiff's life transitioning from a single woman with no children living in a single bedroom apartment to suddenly being the primary caregiver for two (2) young children.

34.     Plaintiff informed Mr. Collard that the children were out of school and being taught remotely due to the COVID-19 pandemic and that Plaintiff had to set up childcare and care for them in the interim, including setting up and assisting the children with counseling services and other medical needs.

35.     Mr. Collard told Plaintiff that he would have Human Resources reach out to her and connected Plaintiff with Katherine Paradis ("Ms. Paradis") from Human Resources and Andrew Heilman ("Mr. Heilman"), Regional Business Manager.

36.     Subsequently, Plaintiff received a phone call from Ms. Paradis who told Plaintiff that she was "approved to work from home" for two weeks beginning on December 17, 2020.

37.     However, despite being approved to work from home Plaintiff was still required to work in the branch on weekends.

38.     Upon information and belief, the "approval" to work from home was the decision of upper management, specifically Mr. Heiman, Ms. Paradis, and Tom Walling ("Mr. Walling"), the Regional Rental Manager.

39.     On information and belief, Mr. Heiman, Ms. Paradis, and Mr. Walling were also involved in the decision to terminate Plaintiff's employment.

*Discriminatory Treatment*

40.     Once Plaintiff took on the role of caregiver/mother, she experienced a sudden and drastic change in the way her managers and assistant manager treated her.

41.     Specifically, Plaintiff's leadership and management began commenting on her responsibilities as a mother/caregiver to her young godchildren, including criticizing Plaintiff for use of personal time or use of flexible schedule to care for the children, help them transition, and attend to other medical or school needs.

42.     Throughout Plaintiff's employment, Plaintiff was a salaried employee with a flexible work schedule that allowed for, among other things, coming in and leaving early or later, and taking shorter or longer breaks as necessary.

43.    Notably, Plaintiff was never previously reprimanded for maintaining a flexible work schedule and/or using her available personal time as she saw fit until after Plaintiff was granted guardianship and became a mother.

44.    During Plaintiff's time out of the physical office, Plaintiff continued upholding her job responsibilities as well as caregiving responsibilities for the children, including setting up remote learning at the YMCA.

45.    On or about December 28, 2020, Plaintiff and one of the children tested positive for COVID-19.

46.    When Plaintiff informed Defendant, Ms. Paradis told Plaintiff that she was allowed to take two additional weeks to work from home as "covid time."

47.    Plaintiff physically returned to the office on January 13, 2021.

*Adverse Employment Actions*

48.    After returning to the workplace, Plaintiff again noticed that her assistant manager and upper management were treating her differently and more negatively after Plaintiff took on the role of "mother" and especially after Plaintiff need to work remotely to care for the children, as compared to the previous situation.

49.    Additionally, Plaintiff specifically noticed that her assistant manager, Emily Bean ("Ms. Bean"), a 24-year-old female without children, was increasingly hostile towards Plaintiff.

50.    Upon information and belief, Ms. Bean started to complain directly and privately about Plaintiff's new status as a mother to Mr. Collard.

51.    As Branch Manager, Plaintiff was responsible for setting the monthly work schedule for her branch and scheduled alternating weekends to work.

52.     Ms. Bean suddenly started complaining to Mr. Collard about Plaintiff's scheduling, including falsely stating that Plaintiff was not working her share of weekends or that the scheduling was otherwise unfair.

53.     At all relevant times during Plaintiff's employment with Enterprise, it was within the Branch Manger's power to set their own schedule and the schedule of other workers.

54.     At all relevant times during Plaintiff's employment with Enterprise, Enterprise had a "flex" policy to allow flexible adjustments to schedules.

55.     At all relevant times during Plaintiff's employment with Enterprise, Plaintiff and other Branch Managers were salaried employees permitted to come and go with flexibility.

56.     Even though scheduling was within Plaintiff's discretion as the Branch Manager, Plaintiff was forced to regularly have to answer Ms. Bean's concerns through meetings with Mr. Collard and explain the scheduling only for Mr. Collard to agree that scheduling was appropriate.

57.     On information and belief, the complaints and investigations relative to Plaintiff's work duties and schedule was motivated, in whole or in part, by Ms. Bean and Mr. Collard's negative perception and stereotypical assumption of mothers being less devoted to work rather than any real performance concerns.

58.     Indeed, given Plaintiff's role as Branch Manager, responsibilities, and prior performance, there was no cause or reason for Mr. Collard to investigate or question Plaintiff on the baseless allegations, and, on information and belief, no other branch manager was treated similarly.

59.     Sudden alleged workplace complaints against Plaintiff became so common that Plaintiff and Mr. Collard began having regular one-on-one meetings to discuss Ms. Bean's various baseless concerns, including allegations that Plaintiff was coming in late or leaving early, which

Mr. Collard knew or should have known were baseless or false due to, among others, Plaintiff's flexible work schedule as set forth above.

60.     Despite Mr. Collard knowing these various concerns were baseless he still subjected Plaintiff to continued investigations/meetings due to his own negative perception and stereotypical assumption of mothers in the workplace.

61.     In fact, Mr. Collard explained that Ms. Bean questioned whether Plaintiff was just "using the kids as an advantage to come in later or leave early."

62.     In April 2021, Plaintiff informed Mr. Collard that the childcare program that she had been using for the children's remote learning due to the COVID-19 pandemic was closing and that she needed to use some time off in order to figure out other childcare options for them.

63.     Plaintiff used one week of her accrued PTO during April vacation in order attend to securing childcare.

64.     Plaintiff located a suitable childcare location that would accept her children for remote learning during the COVID-19 pandemic, but it would require some flexibility in her schedule in order for Plaintiff to coordinate with the open hours of the facility for drops offs.

65.     While not required due to her flexible schedule, Plaintiff informed Mr. Collard of her scheduled changes out of professional courtesy.

66.     Upon Plaintiff's return from her leave in April, Enterprise, by and through its agents, subjected Plaintiff to constant harassment and increased scrutiny resulting in a hostile workplace.

67.     For instance, upon Plaintiff's return from her leave in April, Mr. Collard and Ms. Bean began tracking Plaintiff very closely regarding the exact times that Plaintiff arrived to and

left from work despite Enterprise's schedule flexibility policy/practice available to Branch Managers.

68.     In addition to the fact that Plaintiff was salaried and not subject to a set schedule, this increased scrutiny was also unwarranted in light of Plaintiff's 8-year work history of very rarely being late, always meeting or exceeding her work targets and goals, and always being an exceptional employee.

69.     Nevertheless, Defendant, by and through Mr. Collard, further discriminated against Plaintiff by having Plaintiff's subordinates spy on and report on Plaintiff, including requiring an employee to text Mr. Collard the moment Plaintiff arrived at the branch office.

70.     On another occasion, Mr. Collard intentionally waited in Plaintiff's office for no other reason but to track when Plaintiff came in and then left.

71.     Additionally, Mr. Collard's behavior changed in that he would often leave the branch and then come back later for no reason other than to track Plaintiff and make sure she did not leave early.

72.     On information and belief, other employees were not monitored in the same or similar manner nor was Plaintiff ever asked to monitor other employees in the same or similar manner, including with respect to employees with attendance issues.

73.     Also following Plaintiff's return from leave in April, Mr. Collard suddenly began to question why Plaintiff would leave in the afternoons on weekends, to which Plaintiff responded that it was because she picks up the children and drops them off at sports practice but that she did so only during her midday break time.

74.     Notably, prior Plaintiff's caregiving responsibilities, Mr. Collard never previously questioned Plaintiff's whereabouts during the weekends, including whenever Plaintiff had to leave work early or arrive later.

*Internal Discrimination Complaint*

75.     In May of 2021, Plaintiff met with Mr. Collard to discuss her complaints and concerns regarding her mistreatment in the workplace.

76.     During that May 2021 conversation, Plaintiff informed Mr. Collard that it had become evident that Enterprise was trying to make it impossible for her to balance being a successful branch manager and parenting, particularly with the scheduling issues and use of time out of work. Plaintiff further informed Mr. Collard that she was not being supported and, instead, was being treated differently because she was a single mother.

77.     During that same conversation with Mr. Collard, Plaintiff noted that she had "nothing by uphill battles" at work since she became a mother/guardian.

78.     As an example, Plaintiff questioned Mr. Collard as to why Ms. Bean's complaints against her were addressed when, in contrast, Ms. Bean had almost weekly customer and employee complaints towards her that Plaintiff had to resolve and she was never disciplined for them.

79.     Mr. Collard responded that he would have a sit down to come up with a "game plan," but that never happened.

80.     Also in May 2021, Plaintiff had a conversation with one of the upper management team members, Mr. Heilman, at one of the company outings who asked, "why are we hearing that you're not really at work?" and stated that he heard that Plaintiff was not "actively in the branch" and instead, "Emily [Ms. Bean] is running the operations there."

81.    Embarrassed, Plaintiff was forced to explain to Mr. Heilman that she used "flexes" per company policy, but was still at the branch 6 out of 7 days and met all her required weekly hours.

82.    In light of Mr. Heilman's comments, it is clear that despite Plaintiff meeting her job expectations and her successful work history, Plaintiff was not perceived by Enterprise's leadership and management as dedicated and as committed to her career as Plaintiff was prior to becoming a caretaker/mother.

### *Abrupt Termination*

83.    On June 8, 2021, Mr. Collard called Plaintiff into a one-on-one meeting where he informed Plaintiff that Enterprise allegedly received an "ethics hotline" allegation regarding a "potential relationship" between Plaintiff and an employee in the office, Matthew.

84.    Plaintiff was taken aback by the invasion of her privacy and the line of questioning given the other known inter-office relationships in Enterprise, but truthfully responded that that she had a single intimate encounter with Matthew months prior, that there was no on-going relationship, and that there was no impact on the performance of either of our jobs.

85.    Plaintiff had no further discussions with Enterprise or Mr. Collard regarding the relationship until June 15, 2021.

86.    On June 15, 2021, Mr. Collard asked both Plaintiff and Matthew to read and sign a written statement.

87.    On June 17, 2021, Plaintiff was called into a meeting with Mr. Collard and Tom Walling, the Regional Rental Manager, at the regional office.

88.     At the meeting on June 17, 2021, Mr. Collard, Mr. Walling, and Ms. Paradis were present, and Plaintiff was abruptly told that her employment was terminated effective immediately allegedly due to Plaintiff's one-time intimate moment with Matthew.

89.     Notably, Mr. Walling expressed during that meeting that he once "thought [Plaintiff] would go far in the company."

90.     Plaintiff's termination occurred without any prior verbal or written warnings or opportunity to correct any purported deficiencies in violation of Enterprise's own progressive discipline policy.

91.     Plaintiff noted during that meeting that well known long-term relationships were common within Enterprise's organization, yet no one was terminated, and that Plaintiff was unaware that she needed to inform management of a single, private intimate moment.

92.     Mr. Walling simply responded that the termination decision had been made.

93.     To add insult to injury, Plaintiff was directed to immediately turn in her branch keys, company car, and gas card leaving Plaintiff with no transportation to get back home to her young children.

### *Disparate Treatment*

94.     Throughout Plaintiff's employment with Enterprise, office relationships were common.

95.     However, on information and belief, Enterprise did not investigate other employees in the same manner and for the same or similar reasons as Plaintiff.

96.     For example, on information and belief, within Plaintiff's own region, another branch manager, Ashley had relations with a management trainee, Christopher, who was working directly under Ashley's supervision, that turned into and is currently a long-term relationship,

97.     However, once Ashley and Christopher's ongoing relationship was revealed, Defendant simply transferred Christopher to a different location and both Ashley and Christopher remained employed.

98.     Plaintiff is aware of at least ten (10) other actual workplace relationships between supervisors and subordinates, with none of the individuals being disciplined, let alone terminated for the relationship.

99.     Additionally, Ms. Bean was previously reported for issues getting along with a subordinate that she had a prior relationship with, yet neither of the two individuals were disciplined, and Ms. Bean was promoted to Branch Manager following Plaintiff's termination.

100.    Also, the male employee who Plaintiff had a one-time intimate encounter with, Matthew, was not terminated for the exact same incident.

## VII.    Sex/Gender and/ Caregiver Discrimination and Retaliation

101.    Defendant's conduct by and through its agents, constitutes blatant unlawful sex/gender and caregiver discrimination in violation of Title VII and the FEPA.

102.    "[T]he assumption that a woman will perform her job less well due to her presumed family obligations is a form of sex-stereotyping and that adverse job actions on that basis constitute sex discrimination." *See  Chadwick v. WellPoint, Inc.,* 561 F.3d 38, 44 (1st Cir. 2009) (citing to *Nevada Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 730, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003); *Back v. Hastings on Hudson Union Free,* 365 F.3d at 120 (identifying sex-stereotyping where employer stated that a woman could not "be a good mother" and work long hours, and that a woman "would not show the same level of commitment ... because [she] had little ones at home"). Discrimination based on caregiving responsibility is characterized as a "sex plus" claim. *Id*.

103.    This refers to situations where, like here, " 'an employer classifies employees on the basis of sex plus another characteristic' [and] describes the case where… 'employer does not discriminate against the class of men or women as a whole but rather treats differently a subclass of men or women.' " *Id*. at 43 (citations omitted).

104.    Defendant's actions referenced herein were motivated, in whole or in part, based on sex/gender and caregiver discrimination and Defendant's stereotypical assumption that a woman/caregiver will perform her job less well due to her presumed family obligations.

105.    Plaintiff has demonstrated a prima facie case for sex/gender and/or caregiver discrimination as she was a member of a protected class, (2) was performing satisfactorily so as to meet her employer's legitimate job-performance expectations, (3) suffered adverse employment action at the hands of my Defendant, and (4) was treated less favorably than someone outside her protected class.

106.    Adverse employment action based in whole or even in part on account of sex/gender/caregiver responsibilities constitutes prohibited discrimination.

### *Retaliation*

107.    Additionally, or in the alternative, Defendant retaliated against Plaintiff by terminating her employment because Plaintiff engaged in protected activity by reporting sex/gender and/or caregiver-based discrimination in the workplace.

108.    Under Title VII and the FEPA, Plaintiff is expressly protected from retaliatory conduct by an employer for voicing my concerns of policies, practices, or treatment that result in sex/gender and/or caregiver-based discrimination in the workplace.

109.    When Plaintiff reported to Mr. Collard in May of 2021 that Defendant was targeting her and treating her differently because she is a single mother and caregiver, as detailed above, Plaintiff was engaged in protected activity.

110.    On June 8, 2021, approximately thirty (30) or less days later, Mr. Collared suddenly informed Plaintiff that an "ethics hotline" allegation was made against her as stated herein and subsequently terminated her employment.

111.    Despite Plaintiff's and Matthew's explanation that no ongoing relationship existed, Plaintiff was terminated by Defendant without warning or any opportunity to correct any purported issues.

112.    The temporal proximity between Plaintiff's protected activity, the June 8, 2021 pretextual investigation of the purported ethics allegation against her, and her subsequent abrupt termination supports a strong inference that both the investigation of the purported ethics allegation when there were other known actual relationships in the place and her abrupt termination were retaliatory.

113.    The retaliatory nature of the alleged sham investigation and Plaintiff's abrupt termination is also clearly established and supported by the pretextual nature of Plaintiff's termination as set herein.

114.    While Plaintiff's sex/gender and/or caregiver discrimination claims are clearly established, an employee asserting a retaliation claim need not show that the employee's underlying statutory employment law claims are valid, nor is there even an implied requirement that they be reasonable.   *Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir. 1994) (per curiam).  All an employee needs to show is that he or she complained and that, as a consequence thereof, adverse employment action was taken.

*Pretext and Pattern/Practice*

115.    Defendant's patently false and fabricated attempt to justify Plaintiff's abrupt termination is nothing more than pretext, which further supports an inference of discriminatory intent.

116.    The pretextual nature of Plaintiff's termination is also supported by the fact Defendant has not disciplined other employees for engaging in workplace relationships and in fact promoted a similarly situated employee after terminating Plaintiff.

117.    Defendant's intent to discriminate against Plaintiff on account of her sex/gender and/or caregiver role is further established, in part, by Plaintiff's abrupt termination after long and exemplary service without prior notice, warning, or opportunity to correct any purported deficiency.

118.    Defendant's failure to follow its own policies and/or procedures relative to, among other things, progressive discipline, further inferences discriminatory and retaliatory intent against Plaintiff.

119.    On information and belief, Defendant, by and through its agents/employees, has engaged in a pattern or practice of discriminating against employees in the protected sex/gender and/or caregiver class.

120.    On information and belief, Defendant's decision to terminate Plaintiff's employment was part of Defendant's intentional practice of sex/gender and/or caregiver discrimination.

121.    Additionally, and/or in the alternative, Defendant's employment policies or practices referenced herein, or the enforcement of said polices or practices, have a

disproportionately adverse effect on female caregivers, including Plaintiff, for the reasons set forth herein such that Defendant has violated Title VII and the FEPA.

## VIII.    Violations of the FMLA, PFML, and MPLA

122.    Pursuant to the FMLA, employers cannot "interfere with, restrain, or deny the exercise of or the attempt to exercise" any of the leave entitlements."  29 U.S.C. § 2615(a).

123.    Pursuant to the FMLA, Plaintiff was entitled to, at a minimum, up to twelve (12) weeks of leave due to the placement of her children with her for care and to bond with her newly placed children. 29 U.S.C. § 2612(a)(1)(B).

124.    Nevertheless, Defendant did not provide Plaintiff information regarding her leave rights even after she inquired about the same, and, instead, pushed Plaintiff into work from home instead.

125.    Moreover, on information and belief, the harassment, heightened scrutiny, and adverse employment actions Plaintiff was subjected to by Defendant, including her ultimate termination, were motivated by Plaintiff's likely need to exercise her rights under the FMLA and to interfere with the same.

126.    Under the circumstances it is clear that the Defendant's actions had the effect of interfering with, restraining or denying Plaintiff's rights under FMLA.

127.    Additionally, pursuant to 29 U.S.C § 2612(a)(1)(F), Plaintiff was entitled to up to a total of twelve (12) weeks of leave "[d]]uring the period beginning on the date the Emergency Family and Medical Leave Expansion Act takes effect, and ending on December 31, 2020, because of a qualifying need related to a public health emergency."

128.    An employee being unable to work due to a need for leave to care for a son or daughter under 18 years of age of such employee if the school or place of care has been closed, or

the childcare provider of such son or daughter is unavailable, due to a public health emergency is a "qualifying need related to a public health emergency."

129.    For the same reasons set forth above, Defendant's failure to offer Plaintiff leave to care for children when Plaintiff lacked childcare and the children were remote learning gives rise to actionable claims under the FMLA.

130.    Under the MPLA, employees are entitled to eight (8) weeks of parental leave "for the placement of a child under the age of 18" …for adoption with the employee who is adopting or intending to adopt the child." M.G.L. c. 149, §105D(b).

131.    Under the MPLA, "employer shall post and keep posted in a conspicuous place upon its premises a notice describing this section and the employer's policies related to this section", which Defendant failed to do. M.G.L. c. 149, §105D(e).

132.    Under the PFML, employees are entitled to twelve (12) weeks of paid leave "to bond with the [employee's] child…after the placement of the child for adoption or foster care." M.G.L. c 175M §2(a)(1).

133.    Under the PFML, it is unlawful for any employer "to retaliate by discharging, firing, suspending, expelling, disciplining, through the application of attendance policies or otherwise, threatening or in any other manner discriminating against an employee for exercising any right to which such employee is entitled under this chapter or with the purpose of interfering with the exercise of any right to which such employee is entitled under [the PFML]." M.G.L. c 175M §9(a).

134.    For the same reasons set forth above, Defendant violated Plaintiff's rights under the PFML and MPLA by terminating her employment and interfering with the exercise of rights she was entitled to under the PFML and MPLA as a new mother/caregiver.

135.    Additionally, Defendant further violated the FMLA, PFML, and MPLA by failing to provide Plaintiff with proper notice are required under the FMLA, PFML, and MPLA.

*Damages*

136.    Plaintiff's abrupt termination has caused Plaintiff to suffer great emotional distress.

137.    At all relevant times, Plaintiff was discriminated against and not respected nor valued solely because of her sex/gender and/or caregiving responsibilities.

138.    Defendant's is liable for Plaintiff's past lost wages and future lost wages as well as additional monetary damages for economic and non-economic harm Plaintiff has suffered or will suffer on account of Defendant's unlawful actions.

139.    Plaintiff has suffered equitable and compensatory damages, including, but not limited to, loss of income, pain and suffering, emotional distress, loss of enjoyment of life, loss of medical and/or other benefits, humiliation, damage to her professional and personal reputation and other great harm, as a result of being discriminated against by the Defendant in the manner alleged herein.

## IX.    Claims for Relief

140.    Plaintiff incorporates in the counts below the allegations contained in ¶¶ 1 through 139 above.

### Count One
*Title VII of the Civil Rights Act of 1964,*
*42 U.S.C. § 2000e, et seq.*

141.    Defendant, by its individual and/or concerted acts and/or omissions, including, but not limited to those described herein, discriminated against Plaintiff on the basis of her sex/gender and caregiver status and retaliated against Plaintiff in violation of Title VII, and thereby deprived her of rights secured under Title VII, causing her to suffer damages as aforesaid

**Count Two**
**Massachusetts Fair Employment Practices Act**
**M.G.L. c. 151B,** *et seq.*

142.    Defendant, by its individual and/or concerted acts and/or omissions, including, but not limited to those described herein, discriminated against Plaintiff on the basis of her sex/gender and caregiver status and retaliated against Plaintiff in violation of the Massachusetts FEPA, and thereby deprived her of rights secured under the FEPA, causing her to suffer damages as aforesaid.

**Count Three**
**Family and Medical Leave Act**
**29 U.S.C. §2601, et seq.**

143.    Defendant, by its individual and/or concerted acts and/or omissions, including, but not limited to those described herein, violated Plaintiff's rights under the FMLA, and thereby deprived her of rights secured under the FMLA, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the FMLA.

**Count Four**
**Massachusetts Paid Family Medical Leave Act**
**M.G.L. c 175M §1** *et seq.* **("PFML")**

144.    Defendant, by its individual and/or concerted acts and/or omissions, including, but not limited to those described herein, violated Plaintiff's rights under the PFML, and thereby deprived her of rights secured under the PFML, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the PFML.

**Count Five**
**Massachusetts Parental Leave Act**
**M.G.L. c. 149, §105D ("MPLA")**

145.    Defendant, by its individual and/or concerted acts and/or omissions, including, but not limited to those described herein, violated Plaintiff's rights under the MPLA, and thereby

deprived her of rights secured under the MPLA, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the MPLA.

## X.    Prayers for Relief

**WHEREFORE,** Plaintiff prays that this Court grant the following relief:

1.    A declaratory judgment declaring the acts and/or omissions of Defendant, including, but not limited to those complained of herein, to be in violation of the Title VII, the FEPA, the FMLA, the PFML, and the MPLA.

2.    An injunction or other equitable relief directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated.

3.    An injunction or other equitable relief, including, but not limited to, an award of back pay, front pay or reinstatement, other compensation and/or benefits, and to make her whole for all earnings and benefits she would have received but for Defendant's unlawful conduct.

4.    An award of compensatory damages.

5.    An award of punitive damages.

6.    An award of liquidated damages.

7.    An award of prejudgment interest, reasonable counsel fees and costs of litigation.

8.    Such other and further relief as this Court deems just and proper

## XI.    Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## XII.    Designation of Trial Counsel

Plaintiff hereby designates Danilo A. Borgas, Esq., Richard A. Sinapi, Esq., and Chloe A. Davis, Esq., as trial counsel.

Plaintiff,
**Jasmine L. Gonsalves**
By her attorneys,
**SINAPI LAW ASSOCIATES, LTD.**

**Dated: December 21, 2022**                    /s/ **Danilo A. Borgas**
                                                **Danilo A. Borgas, Esq**. **(#690709)**
                                                **Richard A. Sinapi, Esq. (#708722)**
                                                **Chloe A. Davis, Esq. (#691982)**
                                                2374 Post Road, Suite 201
                                                Warwick, RI 02886
                                                Phone: (401) 739-9690
                                                Fax: (401) 739-9040
                                                Email: dab@sinapilaw.com
                                                        ras@sinapilaw.com
                                                        cad@sinapilaw.com